Are you ready? Okay, go ahead. Thank you. Good morning. My name is William Quirk. I'm representing the appellant Mission Regional Medical Health Center today. I'd like to reserve three minutes for rebuttal, if I could. Okay. This is a case for Medicare reimbursement bought by my client against the Secretary of Health and Human Services. Counsel, let me make sure that I understand the basic structure of the thing. Mission buys another hospital in another location. Yes. And that hospital has its Medicare authorization, so it can treat Medicare patients and get reimbursed. Yes. When it does the purchase, it doesn't purchase the stock of the hospital, if it's for-profit or, let's see, I don't know exactly. I never purchased a non-profit. It's an asset purchase. Would you just do an asset purchase? Yes, this was just an asset purchase here, yes. With the asset purchase, usually in the for-profit world, you do asset purchases to avoid being exposed to unknown liabilities or unforeseeable liabilities. In the medical field, I can think of a couple of ways those arise. A doctor was fired, and he may bring a lawsuit for firing him that is in the millions. Patients were hurt, and they may bring lawsuits in the millions. There may be real estate disputes arising out of some new hospital wing that was built, and that could be in the millions. The only dispute that we've got in front of us so far, tell me if I'm right, is the way hospitals typically bill is they bill a lot and then Medicare and the various insurance companies say, this isn't covered, that isn't covered, you can't get reimbursed for this and that, and they often pay the bills when they come in and then claim reimbursement. Have I got it right so far? Yes, you are. Okay, so what's at stake here is several months of excess Medicare payments to the hospital you bought. Yes, it's nine months of payments, approximately nine months. Now, why can't Medicare tell you if you want to buy another hospital, you've got to assume liability for the excess Medicare payments that the other hospital got if you want us to be liable to you for covering Medicare from the get-go? Well, I think it can do that. It is making you pay somebody else's debts, which is what an assets purchase is supposed to avoid, because you didn't overcharge Medicare for those patients, they did. Yes. So I understand that the whole idea of an assets purchase is to avoid that, but why can't Medicare say if you want our approval so that you can bill Medicare patients from the get-go, you have to pay their debts even though you didn't promise them that you'd pay their debts? I think Medicare can do that, but it needs to do it in a published regulation and not in an internal policy. The problem for Medicare here... So you're saying they could do it in a reg if it was in the CFR? Yes, absolutely. In fact, they did do it in 2010 when they deleted the regulation that we relied on. Incidentally, will this case have any lasting effect, or is this case just something that's going to come and go because the regs have been changed? It's a one-off. A one-off, yes. I think it is a one-off case, most likely. There may be another accredited hospital someplace that's making the same claim, but I'm not aware of it. You said that you relied on something when this asset purchase came down. Is this something that you can demonstrate from the record that you relied on what they did, or was this just something that you hoped you'd be able to get rid of the liabilities and then found out about all the stuff you're telling us now afterwards? We relied on the published regulation. And where does it show that when you entered into the asset purchase agreement, where does it show in the record that you were doing so in reliance on? If I said that, I misspoke, Your Honor. We did rely on statements made to us by Medicare contractors, but we're not making an estoppel claim here. So I really probably shouldn't have even said that. But there is correspondence. Well, that was my point. So you were simply to me this strikes me as a sort of a, and I don't mean to denigrate anybody, but it's sort of too cute by a half. Ha-ha, we're going to fix them. We're going to get rid of the liabilities and take all the assets. But isn't this a real case? Were there liabilities that you escaped, or is this just hypothetical? I think it's not hypothetical to us, certainly. So you did escape liabilities. Well, no, Your Honor. We deliberately did not take on the liabilities of South Coast, which was owned by Adventist Health. We left those liabilities there. Those are between Medicare and Adventist. But Adventist is what, so you're telling me they could have gone against Adventist and collected the liabilities? Yes, in fact, it's our. They did? Yes, in fact, they did as far as we know. We are not Adventist. We're not South Coast, but there are public records showing audits. But not in the record. They're not in the record, Your Honor, but I can make available to the court. One of the questions that the court asked us was whether there had been any. Right. So your point is the government gets a windfall here. Yes, the government gets a windfall. Are they trying to get the money twice? No, no. We're not being paid. We're not paid for nine months of providing Medicare services to Medicare beneficiaries. So we're looking at. Oh, so you're saying the government actually got the money from Adventist that it had overpaid Adventist. No. But you're still out what you billed on Medicare patients for that nine months. The Adventist money is for the period before July 1st, 2009, which is when we purchased South Coast. Why didn't you just accept the liabilities and get rid of this whole thing? They apparently made that offer to you a couple of times. Just sign on and no problem. You'll get your money. And you didn't do it. Why not? There was an option, which we call Option 1, under 489.18, which allowed us to do that and accept the provider agreement. But there was a second option, which we call Option 2, which is 413.d.49, which lets accredited hospitals like us become eligible for Medicare payments upon fulfilling any additional requirements. The only additional requirement here was filing the Form 855A. So, again, instead of taking Option 1, which you would have just accepted the liabilities and we'll move on down the road, the way most of these things usually work, you're still trying to get out from under. Well, we're not trying to get out from under, Your Honor, because Medicare, to our knowledge, has recovered any money that it was – any reimbursements that it was due. It's not in your record. So Medicare is not out of nickel here. Medicare is not out of nickel based on our understanding of the public records, which we did an Internet search on to determine. We're out approximately $7 million of services that we provided that we're not able to get payment for. And if you'd have taken Option 1, you'd have probably been able to recover against Adventus. Correct? I think so, Your Honor, but the point is – I mean, you just walked backwards into a mess. Well, there were – I'm sure there were business reasons at the time why Mission did not want to take on the liabilities. I can't tell you what those are. I would think we wouldn't want to take on other liabilities for sure, because at least when I used to litigate in this field, you constantly had big claims by doctors against hospitals for loss of privileges and patients' malpractice cases and construction disputes. Right. We definitely didn't want that. You wouldn't want that. But under the published regulation, which says that it currently – If you had taken it on, if you had undertaken the liability, then I guess you would have needed to deal with Adventus so that they would indemnify you. Yes, it would have been a more complicated transaction. Or an action against Adventus for indemnity. Yes. But what we chose was the second option, which is 489.13d, which says that currently accredited providers – and those are hospitals like South Coast and us, Mission, both of whom had been accredited by the recognized agency so that we were deemed to comply with the Medicare standards. Well, that depends on how you interpret currently accredited. Well, at the time we filed the Form 855A, South Coast was accredited and Mission was accredited. As I recall, accreditation, one kind, the main kind that everybody is familiar with, is did they sterilize their equipment properly, did they have adequate shifts of nurses to take care of patients who need attention from nurses, that sort of thing. But another kind of accreditation is do they pay us back when they've overbilled us and we paid them. We're only talking about the former. If we're accredited by a recognized agency, then we're deemed to comply with the Medicare health standards. During the second process, it was determined that you were out of compliance until you straightened out a couple of things. There were three standards, Your Honor, but they were not conditions, and those standards don't affect Medicare eligibility. Well, then why did they hold you up until you complied with them? Well, Your Honor, why did they hold us up for nine months before that? It wasn't based on the survey. That was like a week and a half. I thought when those other two or three noncompliances, they said it was cured and it was good non-proton, so you could get paid from the beginning despite what the survey found. That's not correct? No, they did not. We asked that the retroactivity provision be applied, and Medicare refused to apply it. What level of deference, if any, do we give to their interpretation of their own inside information? I don't think there's any deference to be afforded to an internal policy, which is what we have here. Clearly, Medicare wanted buyers to take the assets and the liabilities, but they had a regulation, 4913, that gave a second option to accredited hospitals. And they've interpreted that as not covering the situation that you bring to us? Not really, Your Honor. Do you know whether there's any past? Obviously, that's how they interpreted it for this. Are you aware of any time in the past that they interpreted it that way, or was this the first time they interpreted it? Your Honor, their policy, which they issued, their internal policy in the fall of 2008, which was before this acquisition, clearly said what they say it says. Our point is that policy was unpublished. There was a regulation. Right, so if it had been published, then you still could complain, but you wouldn't have as good an argument. Well, I don't think we really would be complaining, and I don't think we would have taken the course we took. We would have accepted the provider agreement or not done the deal. The policy was something Medicare staff would know about, or CMS or whatever they call themselves, but it's not something that was made public? So the acquiring hospital would not know when the purchase was made in this case that they were going to have to cover the acquired hospital's reimbursements? I can't tell you what the acquiring hospital knew precisely. What would they know from what was published? What they knew from what was published was that there were two ways to do this. You could acquire the assets and liabilities, automatically take the provider agreement, or if you were an accredited hospital, all you had to do because you were already accredited was to file the Form 855A to explain the change. You're kind of characterizing the language in your favor. It isn't quite what the language says, is it? The language says accredited provider requests participation in Medicare programs. Accredited provider. Yes. So you're just assuming that you continue to be the accredited provider under these circumstances? Their argument is you weren't. Well, I'm saying that when we filed the Form 855A in June of 2009, before the acquisition, we were both currently accredited, South Coast and Mission. There's no dispute about that. So it's a timing question then? Well, I think so. Medicare, the Secretary says that our accreditation vanished when we filed the Form 855A. The only thing that vanished is the provider agreement. There's nothing in the regulations that says you would lose your accreditation. That's just something that's in this internal policy. If the internal policy were a published regulation, then it would be open and shut. You'd lose, right? Yes, we would lose, yes. I agree with that. But it wasn't published? It was not published. It's in the record what they're relying on. It's a record excerpt. I believe it's 321 to 335. That's their policy, their internal policy. It shows that it went to state survey directors. It didn't come to us. And as far as we know, it wasn't published. The regulation was published. They rescinded the regulation in 2010 for the reason that it could be used the way we used it. That's the reason. Okay, I think we understand that. Do you want to save the balance of your time for rebuttal? Thank you. Thank you. Good morning. Good morning, Your Honors. Assistant U.S. Attorney Kathleen Unger on behalf of the Secretary of Health and Human Services. Do you accept the claim that there were two options available to somebody under these circumstances? We do not. I'm shocked. Go ahead. What mission is characterizing as option two was not an option that was available. Can you put your mic down just a little? It's kind of covering your face for me. Thank you. Of course, yes. What they claim is option two was not an option available, and it is solely based on their interpretation of the CFR regulation. I'm having trouble seeing what's wrong with it. I mean, you sort of have to be crazy to buy a hospital or a medical clinic or group where you just assume all assets and liabilities because the unforeseeable liabilities can be enormous and frequently are for just the things that I described. They come up all the time. Doctors who are terminated bring lawsuits about termination of their hospital privileges, patients who bring malpractice cases, and construction disputes. The medical facilities you see now, they're all doing construction because there's just so much money in that business, and they have huge disputes. So I can't imagine that anyone would make an assets or purchase liabilities generally. Now, on the Medicare liabilities, I can't see why anyone would do it. My impression is that the regulations are very abstruse and very highly debatable and debated between medical providers and Medicare, CMS. And the practice of the hospitals is they tend to vastly overbill, and then Medicare claims a whole lot back and they fight about it, and then the hospital pays a lot back. And you don't know what that liability is going to be either. I can't see why anyone would buy it. Now, if they're buying the hospital from an assets-rich group that could indemnify them, well, okay, they undertake to keep Medicare happy and pay all the overpayments to Medicare that were made to the previous people. But many purchases are made because the purchased entity is cash short. And in that case, I can't see why they'd do it unless there was a published regulation that said you have to do it. So if they figure we're going to owe $1 million, $2 million, we just pay $1 million, $2 million less for the acquired facility. But since you don't have a published regulation, why would they do it? Well, first of all, I agree with your point about liabilities in general, and certainly that's not an issue here because what did matter was accepting liabilities for Medicare overpayments. You could accept those without accepting all the other liabilities. It's a contract between the two providers. Absolutely. But why would they unless there was a regulation saying they had to? The regulation at 42 CFR Section 489.18 says that in order for the provider agreement to be assigned to the new provider, all the terms and conditions of that provider agreement have to be accepted, and that includes those liabilities to Medicare. Well, provider agreement says if you pay me too much money, I have to reimburse you, and that's basically the form of the provider agreement. But adopting the terms of the provider agreement would be if you overpay me, I have to reimburse you, but not if you overpaid somebody else in the past, I have to reimburse you for what you overpaid them. So what Section 489.18 provides for is assignment of the same provider agreement so that the new provider. Well, it's assignment of the agreement, which means that they have the same kind of duty the old provider had to reimburse excess payments, but that's not the same thing. Let me give you a hypo to make the distinction I'm trying to voice clear. Dr. Jones has had his own independent practice. He's been practicing for years, and he bills Blue Cross and Medicare and Aetna and everybody, and they dispute the bills, they claim reimbursements, he makes reimbursements, he has a staff that does this for him, and eventually Dr. Jones just gets tired of having to pay all the personnel and he's going to become a hospitalist. So he goes to work for the hospital. Now, he's had a Medicare provider agreement, and the hospital has a Medicare provider agreement. Whatever overpayments the hospital made to Dr. Jones when he was in his independent practice, Dr. Jones has to pay. The hospital, even though it takes Dr. Jones in as a hospitalist with the same agreement, we will reimburse any overpayments, it doesn't reimburse the overpayments that were made to Jones. It only reimburses the overpayments made to the hospital. Why isn't that analogous? Well, in this case, you have to think of that assignment of the provider agreement as providing for a continuity of a relationship where it does reach back so that overpayments made to Why do I have to think about it that way? With Dr. Jones, I don't have to think about it that way. Because that's the way Section 489.18 works. Works, not the way it reads. Section 489.18 says that in order for assignment to occur, all the terms and conditions of the provider agreement must be taken on, and that if the terms of the provider agreement are taken on, then assignment is allowed. And then if you look at the Vernon Home Health case, that makes it clear that once a new provider does not take on those liabilities and does not accept the assignment of the provider agreement, then they're treated as a new applicant. But the only way you know that the accreditation survey is an additional requirement within the meaning of 489.13d is you have to look at the unpublished memo, right? You have to look at Section 489.18. But it's not public, so how could you look at it? You have to look at Section 489.18 to understand how it works in an acquisition. Specifically with regard to Section 489.18. All it says is you can't change the deal with Medicare. It doesn't say you have to pay the acquired entity's debts to Medicare. But the provider agreement does require that all debts be paid to Medicare, and those are the terms and conditions that are incorporated. My debts, not somebody else's debts. But those are the debts that are part of the provider agreement. The provider agreement gets carried forward to the owner. Let's take another term of the agreement. Suppose the agreement says you have to send your bill to Medicare within 30 days of the end of the hospitalization. I don't know what they'd say, but let's just say it says you have to send your bill to Medicare within 30 days of the end of hospitalization. So either death or discharge starts the 30 days running. And the acquiring hospital says, okay, we're acquiring the terms of the agreement, and so that's what we do. We always send the bill within 30 days of death or discharge of the patient. Well, it turns out the acquired hospital had a slow bookkeeping department, and they sent some bills in late, 40 days after death, instead of within 30 days after death of the patient. Assuming the agreement would just mean that the acquiring hospital has to keep its own billing department prompt. It doesn't have any effect on the acquired hospital. All it means is the acquired hospital and whatever people have financial interests there are going to lose the money they earn taking care of the dead patient. Well, the way it works under the Medicare program is that the acquired hospital is ordinarily, if there's assumption of the provider agreement, no longer responsible. The responsibility transfers to the acquirer with the provider agreement. That creates continuity. Well, you wouldn't say in my hypo that the acquiring hospital had had the slow bookkeeping department, they repeatedly violated the 30-day rule, and therefore they weren't accredited, or would you? Well, I can't speak to the hypothetical. You're talking about something that I don't think is directly on point in this case. Well, we're talking about what it means to assume an agreement. And you're saying what it means to assume an agreement is to become responsible for the acquired party's debts because the agreement says, I'll reimburse you for overpayments you make to me. Correct, because the Medicare program... And what I'm saying is that is the general structure of the deal, but it refers to the person who made the agreement. The person who has to reimburse is the person who got the overpayment. I can't see why you'd read it otherwise. And my hypo is just the flip side of that. What's helpful to understand about the Medicare program is that payment reimbursements to hospitals are done on an initial basis based on estimated costs. And then at the end of a reporting period, typically the end of a year, then adjustments are made and underpayments by the hospital and overpayments to the hospital are identified. Medicare will go ahead and pay the balance on underpayments and will ask for the overpayments back. So it's the system where there are initial payments and then an after-the-fact accounting. And that's the after-the-fact accounting on the same payments that is at issue here. And that's standard operating procedure that goes on all the time. That's how the program works. Does your case really rise or fall based on 489.18d? Do you mean 489.13d? No, 489.18d. One of the conditions in section 489.18d for assignment of the provider agreement is that the new provider agreement be, quote, subject to all applicable statutes and regulations that are the terms and conditions under which it was originally issued. So our case falls not only on that, but also on the fact that section 489.13d does not allow for the interpretation that Mission Hospital has posited. So why did you change the CFR? Was it because it was ambiguous? The main reason that that section was changed to incorporate the requirements for accredited providers along with those for providers who followed the survey. Has this happened in other cases? I don't have any information about that. That regulation was changed primarily to eliminate the retroactivity provision, and it was not changed to change the effect of how effective dates are calculated for providers who use accreditation as opposed to surveys. Does Medicare get a windfall by taking this interpretation in this particular case? I don't believe so. I think that the issue here with respect to overpayments that were identified as owed by South Coast is, if you look at it after the fact, perhaps it's tempting to say that there might have been a windfall, but you have to keep in mind that Medicare is devising policy that will work prospectively and with respect to helping providers to assume the liabilities and to assume provider agreements, allowing continuity, which allows that system that I described to you regarding payments to work on a continuous basis. This may not be in the record, but did Medicare recover overpayments and correct with Adventist the seller? Let me specify that South Coast was the provider. So there is actually no relationship between Medicare and Adventist Health. With respect to South Coast, we have identified some overpayments that are still outstanding. We have been unsuccessful in getting complete information on this, unfortunately, because it's handled by contractors and it's very difficult to get that information. But we did want to make the point that what we're talking about here is overpayments in a specific case. But if you think about the potential number of overpayments nationwide in the Medicare system and think about what happens if you lose the continuity of being able to recover those payments from the new provider through the ongoing relationship, you're talking about additional administrative burdens. I just don't see where you can do that without a clear reg that says so. I'm imagining, say, a commercial lease. One of the terms of the lease is you have to pay the rent every month. Another term is the lease is freely assignable so long as the assignee, lessee, undertakes the same terms. He's responsible for the same terms, just like Medicare's regulation. The provider agreement has to be the same. The lease has to be the same. One of the terms is you can have an office here, but you can't have a store here. So the lease is assigned, and the new lessee complies with the term. They have an office there, not a store there. They're paying the rent on time. And the landlord says, well, you haven't complied with the lease because the old tenant was in arrears for three months' rent,  that's Medicare's position here. Medicare is saying the tenant is a tenant, and the tenant is subject to the same terms. The tenant has to undertake to be bound by the same lease, so you have to pay the old tenant three months' rent that were in arrears. That's Medicare's position here because you're saying the old hospital, South Coast, ran up an arrearage to us, and the new provider, Mission, has to pay South Coast's arrearage. I suppose the government could make that condition, just as a landlord could make that condition for assignment of a commercial lease, but they didn't in a reg, and I just don't see how you can read it into a reg that says you have to continue the same provider agreement. That's my problem with your case, and maybe you can educate me a little more so I'll understand why I'm wrong. There are two points I think that will help you understand that. The first is that the same regulation I've already mentioned, 489.18, does require the terms and conditions of the provider agreement to be accepted. That's just like my lease hypothetical. And then the terms and conditions within the provider agreement include the other regulations, and there are other regulations that- It's also just like my hypothetical. The lease says you have to pay the rent every month, and they do pay the rent every month. So there's another regulation that actually says that the provider has to pay back overpayments by Medicare. The provider, but Mission wasn't the provider. It would be more reasonable to read the provider must reimburse to apply to the provider who got the overpayments. I can't see why the provider means some new provider as opposed to the provider who got the overpayments. Because section 489.18 requires that in order to step into the shoes of the old provider, you have to accept those liabilities. And you're right that providers do not have to do that. What words are you relying on in 18 now? It's 418. I've got it right here. 489.18D. It seems highly probable that had they decided to do this, they could have accepted the liabilities and then cut a separate deal with the seller to recover from the seller or in the negotiation of the purchase price, whatever they were talking about. I think that that's right. But the words here, they don't say you have to assume the old provider's debts. All it says is that it's subject to the same terms and conditions under which it was issued, including an existing plan of correction, compliance with health and safety standards, compliance with disclosure requirements, and compliance with civil rights requirements. Including. And the terms and conditions under which it was originally issued are part of the provider agreement, and part of the provider agreement's terms and conditions are that the rest of part 489 applies. So those regulations are incorporated into the provider agreement, and those regulations in turn provide for the provider, which is now the new provider, to assume those Medicare overpayment liabilities. Now, as I was saying, it is possible for a provider to not accept the ongoing relationship with the provider agreement. But what happens in that case is that they become a new applicant to the program. But they're not a new applicant. They're not a new provider. Everybody here is a legit, established provider. It's just they don't want to pay somebody else's debts for overpayments. And in this case, what you have is Mission Hospital, already an established provider for its Mission Viejo campus, but not already an established provider at what became its Laguna Beach campus. And that's why you need to look at Section 489.13 and understand that the Departmental Appeals Board interpretation of that to recognize that currently accredited did not apply to either mission. Well, the Department, but I think on that point, though, the appeal kind of backed away from it's not exactly this. There was a little bit of discrepancy between what happened on the appeal, right? The ALJ was wrong on one point. They said that wasn't important. The Departmental Appeals Board identified the currently accredited requirement not as one of the additional requirements under the subsection of D1, but as the threshold requirement of subsection D1. But that currently accredited requirement still is key here. And although Mission is interpreting that as applying to its preexisting accreditation for its Mission Viejo campus or to South Coast's preexisting accreditation for its hospital, that's not the way the Departmental Appeals Board interpreted it. All right. I think we have your argument in mind, unless my colleagues. Do you have another question? Go ahead. Do we owe any deference to anybody here? We absolutely do. That was my next point. To whom and why? It's a deference to the agency's interpretation of the regulation, specifically the Departmental Appeals Board determination that currently accredited does not apply to either Mission Viejo's preexisting accreditation or South Coast. So it's to the DAB. It's to the DAB, exactly. And that has to be either arbitrary, capricious, in violation of the law, or how would you articulate it? To the extent that it's an interpretation of Section 489.13, it's that the agency's interpretation is controlling unless the interpretation is plainly erroneous or inconsistent with the regulation. Are you saying then that the critical words here in 489.13 are the words of D1, currently accredited? Yes, I am. So that even though Mission was currently accredited and South Coast was currently accredited, you're saying that South Coast is no longer currently accredited the moment Mission buys it? What you have to remember is that South Coast ceased operations and the assets transferred over to Mission became the Laguna Beach campus. I need to ask you another question about that. I'm sorry. Is that okay? Suppose your interpretation was correct, and suppose this was a continuing case instead of a one-off. I think the law would have to be the same if the regulation had not changed and the interpretation would, I can't see where being a one-off gives you special privileges to win. I suppose that would mean that when Mission acquired South Coast and did not want to undertake a liability to reimburse Medicare because they really had no idea the extent to which South Coast might have overbilled Medicare, what they would have to do for the nine months it took or however long it took is throw out their elderly patients, tell them you've got to go to some other hospital and not accept any new elderly patients until this was all worked out. So for nine months the South Coast hospital is unavailable to old people. Is that right? I do not know the answer to that, Your Honor. I guess the answer has to be either that or treat them for free, doesn't it? It has to be one of those two, but it might have been the latter. But the thing to keep in mind is hospitals love to give away millions of dollars. The thing to keep in mind was that Mission had the option between assuming the provider agreement and being able to start billing immediately. To put this in concrete terms, you're saying Mission had the option of undertaking to pay whatever excess South Coast might have gotten from Medicare or else have to treat old people for free or else throw them out of the hospital. Well, it had to be treated as a new applicant, and it needed to make arrangements for a new survey. Now you're explaining why, not what. You're saying that's fair because they'd be a new applicant, but I'm asking you the what, not the why. And the what is one of those three things, either pay money that somebody else got in error or treat old people for free or throw old people out. It's got to be one of the three things, right? You're characterizing the... What Mission has to do when it buys South Coast. If it doesn't accept the provider agreement, it does have to be treated as a new applicant, and there is a break in coverage. You're giving a conclusory rather than a factual answer. You're giving a conclusory legal answer if it doesn't accept the provider agreement. I'm trying to find out factually what that means concretely. Forgive me, Your Honor. And the whole dispute is whether accepting the provider agreement means paying somebody else's debts. Your position is that it does. Accepting the provider agreement means Mission has to pay South Coast debts for excess payments from Medicare. So I think what you're telling me, and I just want to know if this is true, is that when Mission buys South Coast, either it has to promise to pay whatever overpayments have been made to South Coast or it has to let the old people stay in the hospital and accept new old people and not get paid for treating them, or if it doesn't want to treat them for free, then everybody over 65 gets evicted from the hospital as a patient, and if they show up at the hospital for treatment, they get rejected. And I appreciate your point. What I'm trying to say is that those two options, either treating people for free or kicking them out, is not in the record. It's not something that I can say would be the case. What else could be the case? I would be very happy to look into it and provide supplemental briefing. But that could be the case, and you could still win. It just doesn't sound very nice right here. Okay, so I think you can say that could be the case. And it's not just debts. It's underpayments too. I'm sure you could make it sound nice. I'm not asking about whether it's good PR. I'm just asking, is this what it means? And I agree with Judge Callahan. I can say confidently that it could mean that. I cannot confidently say that it does mean that without looking into it more. I would be happy to look into it more if you would like that. But what I was trying to say is. I don't think we need to say any more. I think we're plenty over time on that point. Thank you very much, Your Honor. Okay, thank you. All right, I think he has a little bit of rebuttal here. Briefly, we're still talking about a policy preference. The Department, the Secretary wanted buyers of hospitals to take on liabilities. And they affected that policy in 2010 after our acquisition when they amended their regulations. In 2009, we did not accept the provider agreement. That is the section the government keeps citing, which is 489.18. That's talking about how do you accept a provider agreement. We weren't accepting a provider agreement. We were applying as an accredited hospital wanting to participate in Medicare. We had two accredited hospitals. Both filed Form 855A. And the DAB said it doesn't work. They interpreted the regulation against you. Why is that interpretation necessarily erroneous to the point where we can't accept it? First of all, the DAB made a couple of mistakes. It said we didn't insist on South Coast accreditation until the end of 2009, and we did. It said we didn't argue that below. But the bigger point is the published regulation says one thing, 489.13d. It says what do you do if you're an accredited hospital. 489.18 is something else. It's talking about accepting provider agreements. The government, you notice, says that the main purpose and one of the primary purposes of changing, of deleting section 489.13d, was to effectuate some other policy. But it's clear from reading the comments that it was deleted because it treated accredited hospitals differently. And that's what we were, an accredited hospital. Using that regulation is perfectly valid. The interpretation they're urging was unpublished, and it can't control over the published regulation. Okay. I'm not trying to say that the time was unbalanced, but I think that my colleagues both articulated both of your positions really quite well. I think so. So I think I understand both of your positions, listening to both of my colleagues, and to you as well, so thank you. This matter will be submitted.
judges: Trott, Kleinfeld, Callahan